UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Fin Brand Positioning, LLC,
Martin Eldon Lapham, and
Julie Lapham

     v.                        Civil No. 09-cv-405-JL
                                    Opinion No. 2011 DNH 200
Take 2 Dough Productions, Inc.,
David Tully, and Dawn Tully


**AMENDED OPINION & ORDER**

This case (like most) rises from a dispute over dough. Plaintiffs Martin and Julie Lapham, together with Martin's marketing company, Fin Brand Positioning, LLC, claim that defendants David and Dawn Tully and their company, Take 2 Dough Productions, Inc., agreed to share the ownership of a company that produced, marketed, and sold pizza dough at retail. Plaintiffs allege that defendants then breached that agreement and misappropriated intellectual property that plaintiffs had developed, including a special box that would rise with the dough while it proofed. The second amended complaint asserts claims for (1) unfair and deceptive trade practices, see N.H. Rev. Stat. Ann. § 358-A; (2) breach of contract; (3) promissory estoppel; and (4) unjust enrichment. This court has jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).

The defendants have moved for summary judgment, see Fed. R. Civ. P. 56, arguing that (1) the undisputed material facts show that the parties never entered an enforceable contract to enter into business together; (2) plaintiffs' promissory estoppel claim is barred by the existence of an express agreement on the same subject as the alleged promises, and further fails because there is no evidence that plaintiffs detrimentally relied on the alleged promises; (3) plaintiffs' unjust enrichment claim fails because plaintiffs were fully compensated for their work and property; and (4) defendants' alleged conduct does not constitute a violation of R.S.A. 358-A.

After hearing oral argument, this court grants the motion in part and denies it in part.  Defendants are entitled to summary judgment as to the breach of contract claim because plaintiffs failed to disclose in discovery the alleged April 22, 2009 and June 2009 oral agreements upon which they premise that claim, thus rendering the existence of those agreements an impermissibly manufactured factual issue under applicable precedent.  In any event, the alleged contracts were fatally indefinite as to their terms.  As to the remaining claims, however, a rational finder of fact could conclude that defendants promised plaintiffs that they would enter into business together, and that this promise was part of an intentional scheme of deception that induced plaintiffs to devote time and expense to their joint undertaking

2

and to turn over the rights to the special dough box to defendants.  Because the court cannot resolve those claims as a matter of law (at least on the current record), the parties must be put to their proof at trial.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id.  But the court need not credit "conclusory allegations, improbable inferences, or unsupported speculation." Meuser, 564 F.3d at 515 (quotation omitted).  The following facts are set forth accordingly.

II.  **Background**

A.  *Creation of PaneBelle*

Since 1993, defendant Take 2 has produced and sold at wholesale a frozen dough ball used for making pizzas, calzones, breads, rolls, breadsticks, and fried dough.  Defendant David Tully owns and manages Take 2 with the assistance of his wife, defendant Dawn Tully.

Though David had occasionally thought about expanding Take 2's operations from the wholesale market to retail, he lacked sufficient knowledge and experience in the retail market to do so himself.  In November 2008, David attended the Northeast Restaurant and Lodging Show, where he met plaintiff Julie Lapham.  Julie had worked in the food industry since 1994, creating sales and promotional plans and developing marketing strategies for other companies.  After hearing that Julie had brought other food products to the retail market, David expressed interest in further conversations with her.

Julie and David met again in January 2009 to discuss how Julie's skills and experience could help Take 2 break into the retail market.  After that meeting, at David's request, Julie prepared a consulting agreement between herself and Take 2, which David (on behalf of Take 2) and Julie signed on January 30, 2009.  Under the terms of that agreement (the "January 30 Agreement"), Julie was to establish a wholesale-to-retail business strategy

4

for Take 2 by, among other things, creating a marketing plan and sales plan for Take 2.  In exchange for her work, Take 2 agreed to pay Julie a consulting fee of $2000 per month, a ten percent commission on all wholesale to retail gross sales, and pre-approved expenses.  The January 30 Agreement covered a limited trial period from February 1, 2009 through April 30, 2009, after which the parties could extend, alter, or terminate the contract.

The January 30 Agreement provided that Julie would "oversee the process of creating a new product name, logo and package design." Document No. 39-5 at 2.  To accomplish that goal, Julie agreed to "utilize the creative services of Fin Brand Positioning at no charge to [Take 2]." Id.  Plaintiff Fin Brand is a limited liability company, specializing in the development of branding and marketing materials, that is owned by Plaintiff Marty Lapham, Julie's husband.  Under the January 30 Agreement, Fin Brand was to "provide electronic artwork for the new product name, logo, and package design," though "[p]ayment for any additional services such as[] printing, professional photography, professional copywriting and professional illustration [was] to be the sole financial responsibility of [Take 2]." Id. at 3.  According to Marty, he agreed to this arrangement as a favor to Julie.

So began the working relationship among Take 2, the Tullys, the Laphams, and Fin Brand.  Julie started identifying

5

prospective customers for Take 2, while Marty and Fin Brand began developing ideas for logos and graphics for the marketing and packaging of Take 2's retail dough products. Throughout the months of February and March 2009, David and Julie spoke daily and met at least weekly to discuss logistics for the retail operation. Marty proposed the name "PaneBelle" for Take 2's new retail operation, which David agreed on and adopted. Fin Brand created a logo and artwork for the fledgling business. David was very satisfied with the plaintiffs' efforts, and often remarked that he wanted to engage in a partnership to develop PaneBelle products. As per the January 30 Agreement, Take 2 paid Julie $2,000 per month and reimbursed her expenses from February 2009 through April 2009, but did not compensate Marty and Fin Brand for their work.

At the same time the Tullys and Laphams were creating the foundation for PaneBelle, Marty was working on a concept for packaging Take 2's dough ball for the retail market. PaneBelle's potential competitors packaged their frozen dough balls in plastic bags, and based upon his prior experience, Marty believed PaneBelle could distinguish itself from the competition by packaging its dough in a box. This presented a unique challenge, however: before it could be used for baking, the Take 2 dough ball would need to proof, and during the process of proofing, the dough would rise substantially. Conventional boxes could not

accommodate this expansion, and would rip open as the proofing dough rose.  To prevent this, Marty created an innovative "Mini Proofing Box" with interlocking and telescoping features that allowed it to expand as the dough rose.  After finalizing the design in late February or early March of 2009, Marty unveiled his creation to David, who was impressed and commented that the box was "great" and "wonderful."

**B.**     ***Proposed division of ownership***

The Tullys and Laphams met on April 9, 2009, to discuss the further development of PaneBelle.  While they had originally conceived PaneBelle as a subsidiary of Take 2, at this meeting the parties decided to form PaneBelle as a separate company that would buy product from Take 2.  Not long thereafter, the Tullys and Laphams met again to discuss the ownership structure of the new company.  At this April 19 meeting, the Tullys orally proposed that Julie receive a 25.5% ownership share in PaneBelle.  Under this proposal, Dawn would also own a 25.5% share of PaneBelle, and Take 2 would own the remaining 49%.[1]

Julie did not accept this proposal.  On April 22, she orally countered the Tullys' offer by proposing that ownership of PaneBelle be divided four ways, with David to own a 24.5% share;

---

[1]This ownership structure would allow PaneBelle to market itself as a "woman owned" business because Dawn and Julie would own a combined 51% of the company.

Dawn, 25.5%; Julie, 25.5%; and Marty, 24.5%, in recognition of
the substantial amount of unpaid work he had contributed to the
PaneBelle effort.  In a declaration submitted in opposition to
defendants' motion for summary judgment, Julie contends that the
Tullys orally accepted this counterproposal the same day.

    While, as discussed in Part III.A _infra_, the court cannot
consider this contention for purposes of summary judgment, the
evidence of record, viewed in the light most favorable to the
plaintiffs, suggests that the Tullys led the Laphams to believe
that they were seriously considering the counterproposal.  Not
long after the April 22 meeting, David promised Julie and Marty
that they could have an ownership interest in PaneBelle if Julie
and Marty assigned all their intellectual property rights,
including rights to Marty's "Mini Proofing Box," to PaneBelle,
and if Julie continued her efforts to grow PaneBelle's sales.  On
April 27, 2009, Dawn sent Julie an e-mail attaching a draft
business plan that she intended to submit to various banks in an
effort to obtain financing for PaneBelle.  In a section titled
"Company Ownership," this business plan stated that Fin Brand
would be a 24.5% owner of Take 2 "in exchange for the design of
the PaneBelle Box and Brand," and that Julie would hold a 25.5%
share in PaneBelle.  A later, undated draft of the business plan
also discussed the ownership structure of PaneBelle, identifying

8

"four parties of nearly equal percentage shares" with "a slightly larger share going to the two female parties."[2]

For the remainder of April 2009, Julie performed her duties under the January 30 Agreement and was compensated accordingly. After the January 30 Agreement expired on April 30, 2009, Julie continued to work for the Tullys and was paid $3,000 per month. Believing that she and Marty would become part owners of PaneBelle, Julie accompanied David to a meeting at the Kennebunk Savings Bank to discuss financing for the company; worked on a grant application for PaneBelle, a task that required the preparation and evaluation of extensive financial records; and worked with a contractor to print PaneBelle business cards. Julie and Marty both contacted a patent attorney about patenting the "Mini Proofing Box," and Marty worked with a paper supply company to further develop the design of the box.

In addition, Julie prepared a series of draft agreements in May and June 2009 for the joint ownership of PaneBelle, each titled "Agreement to Form a Legal Structure, including but not limited to an LLC or Corporation."  These drafts divided ownership of PaneBelle among David, Dawn, Julie, and Marty, with the women each receiving a 25.5% share, and the men each receiving 24.5%, and affirmed that PaneBelle would own the

---

[2]The "four parties" identified in the later draft were again David, Dawn, Julie, and Fin Brand.

intellectual property created by Fin Brand, including the "name,
logo, packaging; accounts receivable and all printed marketing
material."  The parties never signed any of these drafts,
however; owing to David's stated concerns with their provisions
regarding the reimbursement of Take 2 and Fin Brand for their
start-up costs and, later, their 2009/2010 profit and loss
forecasts.  Julie provided David with drafts she had rewritten to
address those concerns, but David rejected them--albeit without
voicing any concerns over the division of ownership provisions,
which remained unchanged.  Eventually, Julie received an e-mail
from David's attorney, Scott Edmunds, stating that he was going
to make some minor changes to the agreement to, among other
things, "explain the respective rights and obligations of the
parties (the 4 owners)," but would "not change the concept of the
agreement."  While negotiations were still ongoing, Take 2 and
Julie entered into a second Consulting Agreement with an
effective date of June 22, 2009, and provisions substantially
identical to the first.

C.    *Breakdown of negotiations*

     At the end of June, the Tullys and Laphams traveled
separately to Manhattan, where they attended the Fancy Food Show.
During dinner the first evening, Dawn and Marty got into an
argument over seemingly trivial matters and the evening ended

uncomfortably.  Though the Tullys and Laphams attended the Fancy Food Show together the next day, their relationship remained uncomfortable.  After the Fancy Food Show, David told Julie that he no longer wanted Marty to be involved in the ownership of PaneBelle.

In response, Julie prepared another draft of the PaneBelle ownership agreement, in which ownership was divided equally between David and Julie.  On July 10, 2009, David countered with an "Operating Agreement" for PaneBelle, drafted by his attorney, that gave David a 99% ownership share to Julie's 1%.  This agreement was not satisfactory to either David or Julie, however, and they later met with a different attorney to discuss how to proceed with the formation of PaneBelle.  This attorney suggested that David and Julie contact yet another attorney, Joseph Mazziotti.

On the morning that David and Julie were to meet with Mazziotti, however, David called Julie to tell her that he no longer wished to go forward with the joint ownership at all. David also told Julie that he wanted all the rights to the intellectual property created by Julie and Marty.  Since then, the Tullys and Take 2 have continued to use the PaneBelle name and logo and Marty's Mini Proofing Box to market Take 2's dough.

## III.  Analysis

### A.  *Breach of contract (Count 2)*

In moving for summary judgment on plaintiffs' breach of contract claim, defendants contend that plaintiffs are unable to establish the most basic element of such a claim:  an enforceable contract.  See, e.g., Poland v. Twomey, 156 N.H. 412, 415 (2007). Defendants point out that, while the Second Amended Complaint identifies a written April 2009 agreement as the basis for its breach of contract claim, plaintiffs have adduced no evidence that such a written agreement ever existed.  Plaintiffs retort that they are not seeking to recover under a written agreement, but under (1) an oral agreement struck on April 22, 2009, when they allege the Tullys accepted Julie's proposal that ownership of PaneBelle be split four ways between the Laphams and Tullys; and (2) an oral agreement struck in June 2009 when David offered Julie a 50% share in PaneBelle, and Julie accepted.

These alleged contracts cannot form the basis for plaintiffs' claim for two independent reasons.  First, plaintiffs failed to identify them during discovery.  Second, their terms are too indefinite to enforce in any event.  The court therefore grants summary judgment to defendants on plaintiffs' breach of contract claim.

### 1.   Failure to identify contracts during discovery

Neither of the purported oral agreements was identified in the plaintiffs' responses to defendants' interrogatories, which specifically asked plaintiffs to identify "any and all agreements entered into by and between you and any of the Defendants for which you are seeking compensation, royalty and/or payments."[3] From the record before the court, it appears that neither of the alleged oral agreements was referenced at any other point in discovery, either.  Rather, the first time their existence was asserted was in an affidavit Julie submitted in opposition to defendants' motion for summary judgment.

Julie's affidavit does not create a genuine dispute of material fact sufficient to withstand defendants' motion.  "[T]he non-moving party cannot create a dispute concerning material facts by simply submitting an affidavit that contradicts his or

---

[3]Julie's interrogatory responses listed out a number of purported agreements, including her January 30, 2009 and July 21, 2009 consulting agreements with Take 2; the five unsigned "Agreements to Form a Legal Structure" she prepared in May and June 2009; the July 2009 "Operating Agreement" David's attorney prepared, which gave Julie a 1% share in PaneBelle; a memorandum the second attorney prepared after his July 21, 2009 meeting with David and Julie; and a July 18, 2009 "Certificate of Formation." Plaintiffs do not argue that defendants breached any of these alleged agreements.  Marty and Fin Brand's response to the same interrogatory did not identify any agreement the parties allegedly struck, but merely stated that defendants had, on an unspecified date, "offered me 24.5% ownership of PaneBelle and then asked me to work up a document outlining the work and fees for what I had done so that they could include it in their documents as [they] went out to seek financing for PaneBelle."

her complaint, deposition testimony, or answers to
interrogatories without providing an adequate explanation for
that discrepancy."  Toney v. Perrine, No. 06-cv-327-SM, 2007 WL
2688549, *1 (D.N.H. Sept. 10, 2007); see also Colantuoni v.
Alfred Calcagni & Sons, Inc., 44 F.3d 1, 5-6 (1st Cir. 1994)
("When an interested witness has given clear answers to
unambiguous questions, he cannot create a conflict and resist
summary judgment with an affidavit that is clearly contradictory,
but does not give a satisfactory explanation of why the testimony
is changed.").  The affidavit provides no explanation for its
divergence from plaintiffs' interrogatory responses, nor did
plaintiffs provide an explanation in their memoranda or at oral
argument.  They had ample opportunity to do so after defendants
pointed out this apparent discrepancy in their reply brief.
Rather than address the discrepancy in their sur-reply brief,
plaintiffs merely asserted, without any citation to record
evidence, that "the specific day upon which the agreement was
reached was solicited during discovery."[4]  Julie's affidavit,

---

[4]When questioned at oral argument about their apparent
failure to identify the agreements during discovery, plaintiffs
did not repeat this assertion.  Instead, they maintained that
they had sufficiently identified the supposed April 22, 2009
agreement by alleging in their Second Amended Complaint that the
parties had entered a written agreement in April 2009.  See
document no. 35 at ¶ 14.  Allegations in an unverified complaint,
however, do not constitute admissible evidence sufficient to
withstand a motion for summary judgment.  Am. Airlines, Inc. v.
Cardoza-Rodriguez, 133 F.3d 111, 125 (1st Cir. 1998); United

then, cannot serve to establish the existence of either of the oral agreements upon which they seek to premise their claim for breach of contract, and plaintiffs have not identified any other evidence on that point.  Defendants are entitled to summary judgment on that claim.

## 2.   Indefiniteness of the contracts

Even assuming that the court could credit Julie's affidavit, defendants are still entitled to summary judgment on plaintiffs' breach of contract claim because the alleged contracts are too indefinite to enforce.  Contracts "must be definite to be enforceable," though "the standard of definiteness is one of reasonable certainty and not pristine preciseness."  Sawin v. Carr, 114 N.H. 462, 465 (1974).  In applying this standard, the key consideration is whether the contract's "general structure and specific provisions are reasonably clear," Chisholm v. Ultima

---

States v. One Lot of U.S. Currency, 927 F.2d 30, 32 (1st Cir. 1991).
    Defendants have also argued that because this written April 2009 agreement was the only contract alleged in the second amended complaint, plaintiffs should be barred from relying upon either of the purported oral agreements in resisting summary judgment.  Document no. 45 at 6-7 (citing Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137, 141 (D. Mass. 2006)).  Federal Rule of Civil Procedure 8(e), however, requires that pleadings "be construed so as to do justice."  Doing so here, the fact that the complaint identified a written April 2009 contract rather than an oral April 2009 contract might not require entry of judgment for defendants if--contrary to what occurred here--plaintiffs had actually produced evidence of the oral contract during discovery.

Nashua Indus. Corp., 150 N.H. 141, 145 (2003), such that "a
reasonably certain computation of damages" is possible, Smith v.
F.W. Morse & Co., Inc., 76 F.3d 413, 426 (1st Cir. 1996) (citing
Panto v. Moore Bus. Forms, Inc., 130 N.H. 730 (1988)).

The specific provisions of the oral contracts alleged here
cannot credibly be described as "reasonably clear."  It is true
that some provisions can be discerned.  For example, the division
of ownership in the June 2009 agreement was allegedly a 50-50
split between Julie and David.  The remaining provisions of that
agreement, though, are a mystery:  there is no description of any
other terms in Julie's affidavit, and there is no other evidence
from which the court or the jury could divine any other terms.
The alleged April 2009 agreement is nearly as vague, though a
rational trier of fact could arguably find, based on evidence of
the parties' contemporaneous communications, that the terms of
that agreement were that ownership would be divided roughly
evenly among the four individuals, that PaneBelle would be the
sole owner of all intellectual property created by Marty and Fin
Brand, and that the partners or members would have certain titles
and responsibilities.

But that is as far as one can go.  There is no evidence
whatsoever as to what form the parties' undertaking would take,
e.g., a partnership, a joint venture, a closely-held corporation,
or something else.  Indeed, even Julie's draft "Agreements to

16

Form a Legal Structure" leave this critical term undefined,
providing instead that the parties wished to form a "legal
structure, including but not limited to an LLC or Corporation."
Relatedly, and more significantly, there is no evidence as to how
the joint undertaking's future expenditures and debts would be
financed, or how its profits would be disbursed among the owners.
The omission of these critical terms renders the alleged
agreements fatally indefinite and unenforceable as a matter of
law.  Cf. Transocean Grp. Holdings Pty Ltd. v. S. Dakota Soybean
Processors, LLC, 663 F. Supp. 2d 731, 739-40 (D. Minn. 2009)
(alleged agreement to form a joint venture was too indefinite to
support a contract claim where there was no description of, inter
alia, how parties would be paid, the source of financing, or how
profits and losses would be allocated); Burns v. Dees, 557 S.E.2d
32, 36-37 (Ga. Ct. App. 2001) (finding contract too indefinite to
enforce where it did not state how costs or payments would be
allocated, what the parties' responsibilities would be in the
event of losses, or provide a formula how sale proceeds or
profits would be calculated or how and when profits and proceeds
would be distributed).  This is because without them, there can
be no "reasonably certain computation of damages."[5]  See F.W.

---

[5]The absence of such terms would also make it extremely
difficult, if not impossible, to order specific performance.  At
oral argument, plaintiffs conceded that they are not seeking
specific performance or any other equitable relief.

Morse & Co., 76 F.3d at 426.   Accordingly, defendants are
entitled to summary judgment on plaintiffs' breach of contract
claim for this independent reason.[6]

## B.   *Promissory estoppel (Count 3)*

Plaintiffs also seek to recover for promissory estoppel
based upon the Tullys' alleged promise to grant the Laphams
and/or Fin Brand a share of the ownership in PaneBelle.  Under
the theory of promissory estoppel, "a promise reasonably
understood as intended to induce action is enforceable by one who
relies on it to his detriment or to the benefit of the promisor."

---

[6]Defendants have also made a cursory argument that the
statute of frauds bars plaintiffs from enforcing the alleged oral
contracts because they cannot be performed within one year, and
therefore must be documented by a signed writing.  See R.S.A.
§ 506:2.  This argument fails.  "[W]here a contract could
possibly be performed within one year, regardless of the
expectations of the parties, it falls outside the statute of
frauds and, therefore, need not be in writing."  Trexler's
Marina, Inc. v. P.F.C., Inc., No. CV-92-209-L, 1994 WL 258733, *1
(D.N.H. Jan. 26, 1994).  Thus, a contract that is terminable at
will by either party giving reasonable notice of his or her
intention to discontinue the relationship need not be in writing
because "[i]t is possible, even if unlikely" that such an
agreement could be "extinguished within one year of its
inception."  Id.

This rule applies to the alleged oral contracts at issue,
which were agreements to create some sort of a legal entity for
the ownership of PaneBelle.  What kind of legal entity is unclear
--which is part of the difficulty with plaintiffs' breach of
contract claim--but whatever it would have been, there is no
reason to doubt that it could have been dissolved within a year.
See, e.g., Cadle Co. v. Bourgeois, 149 N.H. 410, 415 (2003)
(holding that a partnership-at-will can be dissolved at any
time).

Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 738 (1988) (citing Restatement (Second) of Contracts § 90 (1981)).  The theory, however, is subject to at least one important limitation:  it "is appropriate only in the absence of an express agreement." Great Lakes Aircraft Co., Inc. v. City of Claremont, 135 N.H. 270, 290 (1992).  Defendants argue they are entitled to summary judgment on this claim for two reasons:  (1) all of plaintiffs' alleged detrimental reliance took place before defendants made the claimed promises; and (2) the parties' rights were already governed by the January 30 Agreement.  Neither of these arguments is persuasive.

First, when the record evidence is viewed in the light most favorable to plaintiffs, a rational trier of fact could conclude that plaintiffs took additional actions, to their detriment and to defendants' benefit, after defendants promised them a 50% share of the ownership in PaneBelle in late April of 2009. Although the January 30 Agreement expired on April 30, 2009, Julie continued to work for defendants when she could have sought employment elsewhere.[7]  Julie also participated in efforts to

---

[7]While defendants paid Julie $3,000 per month during this time, there is evidence to suggest that this was less compensation than she could have earned elsewhere.  Julie's interrogatory responses state that she commanded a base salary of $75,000, which is more than twice as much as defendants were paying her.  It is therefore a question for the finder of fact whether Julie's work during this period amounted to detrimental reliance, even though she was being compensated.

seek financing for PaneBelle, a task that was not encompassed within her duties as a sales and marketing consultant as described in the January 30 Agreement.  She and Marty also continued to devote time and money to the development of the Mini Proofing Box, and both traveled to Manhattan to attend the Fancy Food Show with the Tullys.[8]  A rational trier of fact could find that these actions, all of which post-dated defendants' alleged promise, amounted to detrimental reliance sufficient to support the plaintiffs' claim for promissory estoppel.

Second, the existence of the January 30 Agreement does not foreclose plaintiffs' promissory estoppel claim.  The rule defendants seek to take advantage of is that "promissory estoppel is not available in the case of an express, enforceable agreement between the parties covering the same subject-matter." Rockwood v. SKF USA Inc., 758 F. Supp. 2d 44, 58 (D.N.H. 2010) (emphasis added).  But the January 30 Agreement and the alleged promise deal with entirely different subject matter.  The January 30 Agreement stated that Julie would provide sales and marketing services to Take 2, and was silent as to the ownership of the enterprise that eventually would become PaneBelle.  The alleged promise, on the other hand, had nothing to do with sales and

---

[8]As discussed infra at Part III.C, there is a factual dispute as to whether Marty's work on the Mini Proofing Box was encompassed by the January 30 Agreement at all, even before that agreement expired.

marketing and squarely concerned the ownership of PaneBelle.
Perhaps even more to the point, by its very terms the January 30
Agreement expired on April 30, 2009, while the alleged promise
governed the relationship between the parties long after that
time, and most of the plaintiffs' alleged detrimental reliance
occurred after that date.

Because there is a genuine issue of material fact as to
whether the January 30 Agreement covers the same subject-matter
as defendants' alleged promise, summary judgment is
inappropriate. Cf. GlassHouse Sys., Inc. v. Int'l Bus. Machs.
Corp., 750 F. Supp. 2d 516, 528-29 (E.D. Pa. 2010) (denying
summary judgment on promissory estoppel claim, despite the
parties' enforceable agreement, because the agreement did not
cover the subject-matter of the promises); HealthNow N.Y., Inc.
v. APS Healthcare Bethesda, Inc., No. 05-cv-612, 2006 WL 659518,
*7-8 (N.D.N.Y. March 10, 2006) (denying motion to dismiss
promissory estoppel claim, despite the parties' enforceable
written agreement, because the alleged promises did "not
contradict" the agreement).

## C.   *Unjust enrichment (Count 4)*

Plaintiffs also assert that defendants are liable under a
theory of unjust enrichment.  "A plaintiff is entitled to
restitution for unjust enrichment if the defendant received a

benefit and it would be unconscionable for the defendant to
retain that benefit." Gen. Insulation Co. v. Eckman Constr., 159
N.H. 601, 611 (2010).  Like promissory estoppel, though,
"[u]njust enrichment is not a boundless doctrine," and "the court
ordinarily cannot allow recovery under a theory of unjust
enrichment where there is a valid, express contract covering the
subject matter at hand." Clapp v. Goffstown Sch. Dist., 159 N.H.
206, 210-11 (2009).  Defendants argue--much as they did with
respect to plaintiffs' promissory estoppel claim--that they
cannot have been unjustly enriched because the January 30
Agreement covered the subject matter for which plaintiffs seek
recovery.

     Defendants' argument fails for essentially the same reasons
it was unsuccessful in the promissory estoppel context.  Despite
the general rule, an aggrieved party to a valid contract may
nonetheless assert a claim for unjust enrichment if "the benefit
received was outside the scope of the contract." Id. at 211
(citing Restatement of Restitution § 107(a); Restatement (Third)
of Restitution & Unjust Enrichment § 2, cmt. c).  It is true that
some of the benefit defendants received from plaintiffs fell
within the scope of the January 30 Agreement, including all of
the work Julie did for plaintiffs prior to April 30, 2009 and the
electronic artwork, logo, and graphics created by Marty and Fin

Brand.  The retention of these benefits by defendants cannot serve as the basis for plaintiffs' unjust enrichment claim.

At least some of the benefit defendants received, however, postdated or otherwise fell outside the scope of the January 30 Agreement:  Julie's continued work for defendants after April 30,[9] her efforts to seek financing for PaneBelle, and Julie's and Marty's development of the Mini Proofing Box.  Because the January 30 Agreement did not cover these benefits, plaintiffs may premise their unjust enrichment claim upon their allegedly unjust retention by defendants.

In particular, there is a potential dispute of fact as to whether Marty's work on the Mini Proofing Box, even before the January 30 Agreement expired, fell within the scope of that agreement.  The January 30 Agreement provided that Fin Brand, without compensation from Take 2, would "provide electronic artwork for the new product name, logo, and package design." Document No. 39-5 at 3.  On its face, this provision seems ambiguous as to whether it covers "package design" independent of "electronic artwork," or merely "electronic artwork for package design."  Defendants have not addressed this ambiguity in their memoranda.  While there is some evidence that the parties

---

[9]It should be noted, though, that Julie's work for defendants after June 22, 2009, fell within the scope of another contract--the second consulting agreement between Julie and Take 2--and thus cannot support her unjust enrichment claim.

intended the design of the Mini Proofing Box to be covered by the
January 30 Agreement, the record does not permit resolution of
this issue by summary judgment.  Plaintiffs' unjust enrichment
claim survives defendants' motion.

**D.   *Consumer Protection Act (Count 1)***

Finally, plaintiffs have asserted a claim under the New
Hampshire Consumer Protection Act ("CPA"), which makes it
"unlawful for any person to use any unfair method of competition
or any unfair or deceptive act or practice in the conduct of any
trade or commerce." N.H. Rev. Stat. Ann. § 358-A:2.  While the
statute provides a list of specific acts that violate this
command, the list is not exhaustive and conduct "of the same type
as that proscribed in the enumerated categories" may also qualify
as unfair or deceptive. State v. Sideris, 157 N.H. 258, 262
(2008).  Under the familiar test to determine whether such non-
enumerated conduct is proscribed by the CPA, "the objectionable
conduct must attain a level of rascality that would raise an
eyebrow of someone inured to the rough and tumble of the world of
commerce." ACAS Acquisitions (Precitech) Inc. v. Hobert, 155
N.H. 381, 402 (2007).

The defendants argue that their alleged conduct does not
constitute any of the CPA's enumerated prohibited acts, and the
plaintiffs do not appear to claim that it does.  Instead,

24

plaintiffs maintain that defendants' conduct satisfies the
rascality test.  This is a close question.  The real thrust of
plaintiffs' CPA claim is that defendants broke their promise to
share ownership of PaneBelle with plaintiffs, and ordinarily
"broken promises alone do not rise to the level of rascality
where successful Consumer Protection Act claims dwell."  Franchi
v. New Hampton Sch., 656 F. Supp. 2d 252, 266 (D.N.H. 2009).

The evidence before the court, though, could lead a finder
of fact to find more than just broken promises.  A reasonable
finder of fact could conclude from that evidence that defendants
deceived the plaintiffs into believing that they would be part
owners of PaneBelle in order to induce them to provide their
services for free.  Most significantly, Dawn prepared a business
plan that identified Julie and Fin Brand as owners of PaneBelle.
But when plaintiffs repeatedly tried to memorialize this
arrangement in writing (in Julie's multiple drafts of the
"Agreement to Form a Legal Structure") defendants kept invoking
reasons to avoid executing the agreement.  A rational trier of
fact could find that these reasons were pretextual and that
defendants never had any intention of signing an agreement with
plaintiffs.  Of course, while plaintiffs engaged in what appeared
to be good-faith efforts to work out the details of their joint
ownership of PaneBelle, they continued to devote time and effort
to the development of PaneBelle and the Mini Proofing Box.

Later, after much of this work had been done--largely without compensation-- defendants refused to give plaintiffs an ownership share in PaneBelle, in stark contrast to the terms that had previously been under serious discussion.  This left plaintiffs with nothing to show for their efforts.

While it is not by any means the only rational view of this history, a finder of fact could find that defendants engaged in a course of conduct marked by deception in order to induce plaintiffs to contribute their efforts toward developing defendants' nascent business, and then misappropriated intellectual property developed by plaintiffs.  This would quite possibly "raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Cf. Beer v. Bennett, 160 N.H. 166, 171 (2010) (affirming application of CPA where defendant "made representations, knowing he lacked sufficient knowledge to substantiate them, to induce the plaintiff's purchase"); State v. Moran, 151 N.H. 450, 453-54 (2004) (affirming criminal conviction under CPA where defendant "induced [the victim] to give him $2,300 for materials at a time when he clearly did not intend to perform the work," then "made continuous misrepresentations in an ongoing effort to avoid performing or refunding the deposit").  Summary judgment on this claim is therefore inappropriate, particularly in light of the rule that "[w]hether a party has committed an unfair or deceptive act, within the meaning of the

consumer protection act, is a <u>question of fact</u>." <u>CRMC Bethlehem,</u> <u>LLC v. N. Country Environ. Servs., Inc.,</u> No. 09-cv-344-JL, 2010 WL 3002025, *3 (D.N.H. July 29, 2010) (quoting <u>Chroniak v. Golden</u> <u>Inv. Corp.,</u> 983 F.2d 1140, 1146 (1st Cir. 1993)) (emphasis in original).

## IV.   <u>Conclusion</u>

For the reasons set forth above, the defendants' motion for summary judgment[10] is GRANTED as to plaintiffs' claim for breach of contract, but is otherwise DENIED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: January 5, 2012

cc:   Philip L. Pettis, Esq.
      Scott A. Daniels, Esq.
      James F. Laboe, Esq.

---

[10]Document no. 39.

27